UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
PEDRO CASTILLO,                                  :
                                                 :
                              Plaintiff,         :            09 Civ. 9919 (AJN)
                                                 :
              -v-                                :            MEMORANDUM &
                                                 :               ORDER
BYRON RODAS and CARL KOENIGSMANN,                :
                                                 :
                              Defendants.        :
------------------------------------------------------------------X

ALISON J. NATHAN, District Judge:

Plaintiff Pedro Castillo, an inmate at the Green Haven Correctional Facility ("Green Haven"), brings claims under 42 U.S.C. § 1983 alleging that Defendants Byron Rodas and Carl Koenigsmann were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment, and that Rodas retaliated against him for filing a grievance, in violation of the First Amendment. Before the Court is Defendants' motion for summary judgment. Dkt. No. 75. For the following reasons, Defendants' motion is granted.

I.      BACKGROUND

The Court will first describe the record evidence relevant to Plaintiff's claims, and then briefly summarize this action's procedural history.

A. Factual Background

The following facts and disputes of fact are based on the Court's review of the record, undertaken with particular attention to the evidence cited in the parties' Local Rule 56.1 statements.[1] *See Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000); *Agence*

---

[1] Plaintiff has filed only a response to Defendants' 56.1 statement, not his own statement.

*Fr. Presse v. Morel*, 934 F. Supp. 2d 547, 551 (S.D.N.Y.), *superseded on other grounds on reconsideration*, 934 F. Supp. 2d 584 (S.D.N.Y. 2013). The facts are undisputed unless otherwise noted. Because the Court discusses certain facts in more detail later in this opinion, a general overview suffices here.

Plaintiff is an inmate at Green Haven, in Stormville, New York. Pl. 56.1 Resp. ¶ 1. Under the terms of the consent decree governing the provision of inmate medical care at Green Haven, each inmate is assigned a primary care provider, who can be a physician assistant, a nurse practitioner, or a primary care physician. *Id.* ¶ 15. The "primary interface" between inmates and the medical staff is "sick call," at which an inmate, after seeking permission from a corrections officer, can make an appointment with a nurse, who can then refer them to their primary care provider for further treatment or distribute certain over-the-counter medications. *Id.* ¶ 16. If an inmate's primary care provider is unavailable, the inmate will be seen by another primary care provider. *Id.* An inmate can also make an "emergency sick call" to receive treatment immediately. *Id.* ¶ 18.

For an inmate to receive specialty care, the primary care provider must initiate a "request for consultation." Pl. 56.1 Resp. ¶ 25. Such requests describe the patient's condition and indicate a level of urgency indicating how soon a consultation with a specialist is needed. *Id.* ¶ 26. They are reviewed by a Regional Medical Director ("RMD") responsible for the medical care at several correctional facilities. *Id.* ¶¶ 7–8, 28. After the RMD approves a request for consultation, the request goes to a "quality review company" to determine whether the request meets the applicable standard of care. *Id.* ¶ 31. If the company preliminarily declines the request, it goes back to the RMD for a final decision, but if the company approves the request, it

2

bypasses the RMD and goes to a centralized state coordination system for the scheduling of specialty care. *Id.* ¶¶ 32–34.

After a consultation request is approved, the inmate sees a specialist, who sends a report with any recommendations to the inmate's primary care provider for review. Pl. 56.1 Resp. ¶ 35. The primary care provider then fills out a new request for consultation based on the specialist's report, and then submits it according to the same process. *Id.* ¶ 36.

At all relevant times, Rodas was a physician's assistant on Green Haven's medical staff and was Plaintiff's primary care provider.[2] Pl. 56.1 Resp. ¶¶ 2–4. Rodas is not a licensed physician. Bendheim Dep., Youngwood Decl. Ex. C, at 154–55. Koenigsmann was the RMD for Green Haven and responsible for reviewing its consultation requests. Pl. 56.1 Resp. ¶ 7.

In August 2005, Plaintiff began experiencing hemorrhoid symptoms. Pl. 56.1 Resp. ¶ 49. Hemorrhoids occur in four stages: Stage I is the least severe and Stage IV is the most severe. *Id.* ¶ 42. Stage IV hemorrhoids generally require surgery—a "hemorrhoidectomy"—relatively quickly, but patients with milder symptoms ordinarily "will have relief with conservative or minimally invasive treatment." *Id.* ¶¶ 45, 43. Stage III hemorrhoids do not always require surgery, and depending on the circumstances, they can also be treated with "topical creams and suppositories." *Id.* ¶ 46. Additionally, "hemorrhoid symptoms are 'notoriously waxing and waning,' and there can be months when symptoms do not present themselves." Pl. 56.1 Resp. ¶ 41 (quoting Freed Dep., Dawkins Decl. Ex. K, at 64).

---

[2] Plaintiff presents evidence that Rodas has been suspended since October 2011 after being indicted and pleading guilty to criminal charges unrelated to this action. Pl. 56.1 Resp. ¶ 2. The Court questions Plaintiff's choice to describe those charges in detail since it is well established that "[e]vidence of a crime . . . is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b); *see also Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.").

On August 29, 2006, Plaintiff was seen by Rodas at sick call for complaints of blood in his stool and lower back pain; Rodas prescribed Tucks wipes and ordered a "stool occult blood test," which came back negative for blood.  Pl. 56.1 Resp. ¶¶ 50–51; Pl. Decl., Youngwood Decl. Ex. D, ¶ 8.  From that appointment through May 1, 2007, Plaintiff did not complain about hemorrhoids to the medical staff.  Pl. 56.1 Resp. ¶ 52, Pl. Decl., Youngwood Decl. Ex. D, ¶ 9.  Plaintiff was seen numerous times by the medical staff between May 1, 2007 and February 25, 2008 for various ailments, and at several of these appointments he was given hemorrhoid cream.  Pl. 56.1 Resp. ¶¶ 53–72.

On April 25, 2008, Plaintiff "bled while defecating and felt 'tremendous pain.'"  Pl. 56.1 Resp. ¶ 73.  On April 28, he saw a nurse during sick call; he complained of "hemorrhoids and bleeding from the rectum during bowel movements," and the nurse gave him a pass to go to the clinic that afternoon.  *Id.* ¶ 74.  There, he saw Dr. John Bendheim, who diagnosed hemorrhoids, prescribed "a basin with Epsom salts for soaks and Preparation H and Dibucaine ointment," and noted in Plaintiff's records that Plaintiff "may benefit from" a general surgery consultation.  *Id.* ¶ 75.  Rodas saw Plaintiff on May 1, 2008 and submitted a consultation request for Plaintiff to see a surgeon for follow-up.  *Id.* ¶ 78.  He wrote in his request that Plaintiff was experiencing "rectal bleeding with pain in the rectum on and off for four years," and that conservative treatments were "no longer effective."  *Id.*

On May 22, 2008, Plaintiff was seen by a general surgeon, Dr. Aaron Roth, who conducted a physical examination and referred Plaintiff for "evaluation under anesthesia."  Pl. 56.1 Resp. ¶ 80.  (That meant surgery.  *Id.*)  Roth also recommended that Plaintiff undergo a colonoscopy.  *Id.*  On May 23, 2008, Rodas submitted a request for consultation for further evaluation based on Roth's recommendation.  That request stated that "conventional treatment

4

was no longer effective" and reported that Roth's examination had found a "stage III internal hemorrhoid." *Id.* ¶ 81. From May 22 to August 5, Plaintiff states that he complained of "severe" pain to Rodas and nurses on the medical staff. *Id.* ¶ 80.

On May 23, 2008, Koenigsmann denied Rodas's request for consultation and determined that Plaintiff should be referred for a colonoscopy to rule out more serious causes of his left lower quadrant pain and rectal bleeding. Pl. 56.1 Resp. ¶ 82; Koenigsmann Dep., Youngwood Decl. Ex. B, at 158–59. From a medical standpoint, a colonoscopy is not part of a course of treatment for hemorrhoids, nor is it an effective means of diagnosing hemorrhoids. Pl. 56.1 Resp. ¶¶ 82–83; Freed Dep., Youngwood Decl. Ex. F, at 95–97.

On June 16, 2008, Rodas referred Plaintiff for a colonoscopy. Pl. 56.1 Resp. ¶ 86. The colonoscopy was performed on August 5, 2008, by Dr. Robert Antonelle. *Id.* ¶ 89. Antonelle wrote a report following the procedure, which described "internal hemorrhoids [and] minimal rectal prolapse" that was "easily reducible" and noted internal bleeding. *Id.* ¶ 90 (alteration in original). Antonelle prescribed "Anusol hydrocortisone cream and follow-up as needed," and recommended a follow-up colonoscopy in ten years. *Id.* ¶¶ 90–91. Antonelle's report did not say anything about whether Plaintiff's hemorrhoids required surgery.

In a declaration submitted by Plaintiff, Antonelle indicates that he did not intend for his report to suggest that hemorrhoid surgery was not necessary; in fact, it was his understanding that the treatments he prescribed would be supplemental to the surgery that he anticipated would be taking place. Pl. 56.1 Resp. ¶¶ 91–94; Antonelle Decl., Youngwood Decl. Ex. H. However, "Rodas did not believe surgery was necessary because it was not prescribed in Dr. Antonelle's

plan."[3]  Pl. 56.1 Resp. ¶ 93; *accord* Rodas Dep., Youngwood Decl. Ex. A, at 229–31.  As a

result, he did not request a hemorrhoidectomy on Plaintiff's behalf, and Plaintiff continued to

receive conservative treatments from the medical staff.  Pl. 56.1 Resp. ¶¶ 96, 101–103.

On February 17, 2009, Plaintiff saw a general surgeon, Dr. Bhopale, for complaints of

rectal bleeding; the rectal exam was "normal," and Plaintiff was given two containers of

laxatives.  Pl. 56.1 Resp. ¶ 104.  The nature of Bhopale's examination is disputed: Plaintiff

claims that Bhopale asked him to lower his underwear but did not examine his rectum, and he

asserts on information and belief that "Dr. Bhopale . . . regularly diagnos[e]s his patients or

inmates referred to him with normal findings, even when an inmate has a condition worthy of

medical attention."  *Id.*; Castillo Decl., Youngwood Decl. Ex. D, ¶¶ 41–42.

On February 27, 2009, Plaintiff saw Rodas and requested surgery for his hemorrhoids.

Rodas denied the request and told Plaintiff that his rectal examination had been normal.  Pl. 56.1

Resp. ¶ 105.  According to Plaintiff, Rodas also told him that "the director of the clinic" had

denied his surgery, that he would have to file a grievance if he wanted surgery, and that Rodas

was "not going to do anything else."  *Id.*; Castillo Decl., Youngwood Decl. Ex. D, ¶ 44.

Plaintiff filed a grievance requesting surgery on March 6, 2009, and on March 17, 2009,

Dr. Frederick Bernstein, who reviewed the grievance, responded to it by stating that Plaintiff

would be sent to a general surgeon to determine whether he was an "appropriate candidate for

surgical treatment."  Pl. 56.1 Resp. ¶¶ 108, 110.  Rodas then requested a surgical consultation,

which Koenigsmann approved.  *Id.* ¶ 111.  Rodas placed Plaintiff in the infirmary on March 27,

2009.  *Id.* ¶ 118.  Roth saw Plaintiff and made arrangements for a hemorrhoidectomy, Rodas

---

[3] This statement of fact is listed as disputed in Plaintiff's response to Defendants' 56.1 statement, because Antonelle did not intend for his report to be interpreted in the way that Rodas interpreted it.  However, as explained later in this opinion, Antonelle's intentions alone are not a valid basis for disputing Rodas's subjective thought process.

scheduled the procedure, and Koenigsmann approved it. *Id.* ¶¶ 142, 144. According to Plaintiff,

during his consultation with Roth, "Roth became upset because his recommendation was

ignored." Pl. Decl., Youngwood Decl. Ex. D, ¶ 67. Plaintiff finally received a

hemorrhoidectomy on July 2, 2009, more than a year after Roth initially recommended the

procedure. Pl. 56.1 Resp. ¶ 147.

### B. Procedural History

Plaintiff filed a pro se complaint on December 3, 2009, naming Rodas and Bernstein as

Defendants, and the case was assigned to Judge Jones. Following an initial discovery period,

Rodas and Bernstein moved for summary judgment. In his brief opposing that motion, Plaintiff

conceded that he had named Bernstein as a defendant on the mistaken belief that Bernstein, and

not Koenigsmann, was responsible for denying his surgery after Rodas requested it in May 2008.

Dkt. No. 31, at 12–13. On September 19, 2011, Judge Jones denied the contested portion of

Defendants' motion without a written opinion and granted Plaintiff leave to amend his complaint

to add Koenigsmann as a Defendant. Dkt. No. 38.

After Plaintiff filed an amended complaint and Defendants answered, counsel appeared

on Plaintiff's behalf, and the case was reassigned to the undersigned. The Court granted Plaintiff

leave to file a Second Amended Complaint (the "2AC"), which was filed on May 2, 2012. Dkt.

No. 56. After Defendants answered, the parties engaged in additional discovery, and Defendants

again moved for summary judgment on April 1, 2013. That motion is fully submitted.

## II.   LEGAL STANDARD

Summary judgment is properly granted when, construing the evidence in the light most

favorable to the non-moving party and drawing all reasonable inferences in its favor, "there is no

genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of

law." Fed. R. Civ. P. 56(a); *Ramos v. Baldor Specialty Foods., Inc.*, 687 F.3d 554, 558 (2d Cir. 2012). "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ramos*, 687 F.3d at 558 (quoting *Niagara Mohawk Power Corp. v. Hudson River–Black River Regulating Dist.*, 673 F.3d 84, 94 (2d Cir. 2012)) (internal quotation marks omitted).

As the moving party, Defendants bear the burden of demonstrating the absence of a genuine issue of material fact. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir. 1994). When the burden of proof at trial would fall on the non-moving party, a movant can carry its burden by pointing to a lack of record evidence on an essential element of its opponent's claim. *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). "In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III.    DISCUSSION

Plaintiff brings two claims under § 1983: an Eighth Amendment claim against both Rodas and Koenigsmann, and a First Amendment claim against Rodas. 2AC at 7–8. Defendants move for summary judgment with respect to both of Plaintiff's claims. The Court will address these two claims in turn.

**A. Eighth Amendment Claim**

In Count 1, brought pursuant to § 1983, Plaintiff alleges that Defendants denied him adequate medical treatment in violation of the Eighth Amendment. 2AC ¶¶ 34–36. A prison official's failure to provide adequate medical treatment can constitute "'deliberate indifference' to a substantial risk of serious harm to an inmate," and thereby violate the Eighth Amendment's prohibition against cruel and unusual punishments. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *see Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Courts evaluating deliberate indifference claims must conduct two inquiries. The first is an objective inquiry that asks whether the alleged deprivation of medical care was "sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). The second inquiry is a subjective one that asks whether the charged official acted "with a sufficiently culpable state of mind." *Id.* at 280. Defendants argue that no genuine issue of material fact exists concerning either inquiry, and that they are therefore entitled to summary judgment.

### 1. Qualified Immunity

The Court will first address Defendants' contention that even if they violated the Eighth Amendment, they are entitled to qualified immunity. Def. Br. at 24. The doctrine of qualified immunity protects government officials from civil liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Following the Supreme Court's decision in *Pearson v. Callahan*, 555 U.S. 223 (2009), lower courts have discretion to decide whether the right a plaintiff invokes was "clearly established" at the time of the defendant's conduct before addressing whether that right was actually violated. *See id.* at 236. If the right

was not clearly established, then the defendant is immune from suit, and whether his conduct in fact violated the plaintiff's rights is irrelevant.

In this case, however, the Court will not address the question of whether the Eighth Amendment rights Defendants allegedly violated were "clearly established." That question is a difficult one, which depends on the level of generality at which the rights are defined. For example, Plaintiff assumes that the relevant right is defined by "the elements" of his claim, Pl. Opp. at 25, but in stripping away all the facts constituting the alleged violation, his approach appears to be too broad. *See Saucier v. Katz*, 533 U.S. 194, 202–03 (2001); *Anderson v. Creighton*, 483 U.S. 635, 639–40 (1987). For their part, Defendants argue that they are immune because no precedent suggests that hemorrhoids are a sufficiently serious medical condition. But their focus on symptoms—rather than, for instance, the pain or danger associated with the symptoms—is likely too narrow. The parties' briefing on this issue is sparse. As a result, "there would be little if any conservation of judicial resources to be had by beginning and ending with a discussion of the 'clearly established' prong," *Pearson*, 555 U.S. at 236, and the Court will proceed to consider whether there are genuine issues of material fact concerning whether Defendants violated the Eighth Amendment. There are not.

### 2. Deliberate Indifference

As noted above, the parties contest both the objective and subjective elements of Plaintiff's Eighth Amendment claim. For purposes of this motion, the Court will assume that the objective prong is met—i.e., that Plaintiff "was actually deprived of adequate medical care" and that the deprivation was "sufficiently serious," *Salahuddin*, 467 F.3d at 279–80—because Defendants are entitled to summary judgment on the subjective prong. That is, no reasonable jury could conclude that Defendants acted with deliberate indifference.

The Eighth Amendment forbids only cruel and unusual *punishments*. As a result, the

Supreme Court has described the "deliberate indifference" standard carefully, taking pains to

distinguish it from less culpable mental states. *See Farmer*, 511 U.S. at 835–47; *Wilson v. Seiter*,

501 U.S. 294, 296–304 (1991). The mental state required for an Eighth Amendment violation in

the context of prison medical care is "subjective recklessness as used in the criminal law."

*Farmer*, 511 U.S. at 839. That is, the defendant must "know[] of and disregard[] an excessive

risk to inmate health or safety; the official must both be aware of facts from which the inference

could be drawn that a substantial risk of serious harm exists, and he must also draw the

inference." *Id.* at 837; *accord Salahuddin*, 467 F.3d at 280 (defendant must "act or fail to act

while actually aware of a substantial risk that serious inmate harm will result").

Although the question of whether a defendant acted with a particular state of mind is

frequently a factual one appropriate for resolution by a jury, the Second Circuit has made clear

that summary judgment can be appropriate on the subjective prong of an inadequate-medical-

care claim, and Plaintiff must point to actual evidence in the record permitting the inference that

Defendants acted with deliberate indifference; he cannot rely on conjecture or speculation. *See*

*Salahuddin*, 467 F.3d at 281–82; *Brock v. Wright*, 315 F.3d 158, 164–65 (2d Cir. 2003); *see also*

*Hernandez v. Keane*, 341 F.3d 137, 145–47 (2d Cir. 2003) (affirming Rule 50 judgment for

defendants). For the reasons that follow, the Court concludes that Plaintiff has failed to

introduce sufficient evidence to create a triable issue of fact regarding deliberate indifference, so

Defendants are entitled to summary judgment.

### 3.   Rodas Was Not Deliberately Indifferent

The Court will assess the claims against Rodas first. *See, e.g.*, *Brock*, 215 F.3d at 162

(deliberate indifference must be shown for "each defendant"). Plaintiff characterizes the record

as establishing that he consistently suffered from severe and worsening hemorrhoid symptoms, that he repeatedly complained of these severe symptoms to Rodas, and that Rodas continued to provide the same non-surgical treatments whose ineffectiveness was evident from the very symptoms of which Plaintiff complained. Pl. Opp. at 5–11, 15–16. In several respects, however, that is not what the evidence actually shows. To explain why, the Court must review the record in significant detail.

As an initial matter, in asserting that he "consistently complained about his hemorrhoids," Pl. Opp. at 15, Plaintiff points to certain complaints that did not concern hemorrhoids at all. For example, on May 8, 2007, Plaintiff complained that he "felt a burning sensation while urinating" and was diagnosed with a urinary tract infection. Pl. 56.1 Resp. ¶ 57. On June 18, 2007, he complained of "left lower quadrant pain" and told the nursing staff that hemorrhoid cream—the treatment that he now argues was inadequate—"relieved the pain." *Id.* ¶ 58. And with respect to many of his complaints that were, in fact, "about his hemorrhoids," the record does not always indicate that Plaintiff complained to Rodas, as opposed to someone else. *See* Pl. 56.1 Resp. ¶¶ 63, 65, 66, 71, 74, 79 (describing sick calls or meetings with a nurse).[4] Focusing on Rodas's own response to Plaintiff's symptoms, the record reveals the following:

Plaintiff's hemorrhoid symptoms began in August 2005, but he did not seek medical attention until August 2006, at which point Rodas ordered a blood test and prescribed Tucks wipes. Pl. 56.1 Resp. ¶¶ 49, 50. In his Rule 56.1 response, Plaintiff disputes Defendants' assertion that he did not complain about hemorrhoids following that appointment, noting that his

---

[4] At sick calls, inmates are initially "triaged by a nurse," who may then refer them to their primary care provider or another primary care provider if their own is not available. Bendheim Dep., Youngwood Decl. Ex. C, at 104–05. With respect to the portions of Plaintiff's Rule 56.1 response cited in the text, the paragraphs describing Plaintiff's sick calls do not state whether Plaintiff was referred to Rodas after being triaged by a nurse.

complaints were not always noted in his medical records. *Id.* ¶ 52. But Plaintiff's own declaration states that "between . . . August 29, 2006 and February 2007, it is true that I did not complain of hemorrhoids, because I was keeping up with defendant Rodas' treatment directions." Pl. Decl., Youngwood Decl. Ex. D, ¶ 9. Plaintiff also does not dispute that between February 2007 and August 3, 2007, he did not complain about hemorrhoids, although he sought medical attention for other ailments.[5] Pl. 56.1 Resp. ¶¶ 53–59. On August 3, 2007, a nurse referred Plaintiff to Rodas for hemorrhoid symptoms, and on August 10, Rodas met with Plaintiff, requested a "stool guaiac test," which came back negative, and prescribed hemorrhoid cream and Bacitracin ointment. *Id.* ¶¶ 60–62. It is disputed whether Rodas performed a "physical examination" during that appointment. *Id.* ¶ 60.

From August 2007 to February 2008, it is true that the medical staff—both nurses and Rodas—continued treating Plaintiff with hemorrhoid cream. Pl. 56.1 Rep. ¶¶ 63–72. But in at least one instance, Plaintiff himself requested the cream that he now alleges was inadequate, *id.* ¶ 68, and there also is no indication either that Plaintiff's symptoms were severe or getting worse[6] or, more importantly, that he complained to the medical staff of any severe symptoms. The record simply reflects that Plaintiff saw the medical staff several times and received hemorrhoid cream. No reasonable jury could conclude that, during this period, Rodas was "actually aware" that the treatments he was prescribing put Plaintiff at a "substantial risk" of "serious harm." *Salahuddin*, 467 F.3d at 280; *see Youngblood v. Glasser*, No. 9:10-CV-1430

---

[5] Indeed, Plaintiff's description of his condition, and the medical staff's response to his complaints, must be understood in the context of the undisputed fact that "hemorrhoid symptoms are 'notoriously waxing and waning,' and there can be months when symptoms do not present themselves." Pl. 56.1 Resp. ¶ 41 (quoting Freed Dep., Dawkins Decl. Ex. K, at 64).

[6] In August 2007, Plaintiff's symptoms included "burning, itching, and irritation," and "always bleeding during bowel movements." Pl. 56.1 Resp. ¶ 61.

(NAM/DEP), 2012 WL 4051846, at *8–9 (N.D.N.Y. Aug. 22, 2012) (no deliberate indifference

where inmate complaining of hemorrhoids was given "stool softeners and ointment" by a nurse),

*adopted*, 2012 WL 4051890 (N.D.N.Y. Sept. 13, 2012); *Domenech v. Taylor*, No. 9:09-CV-162

(FJS/DEP), 2010 WL 6428459, at *8 (N.D.N.Y. Sept. 8, 2010) (same where inmate was given

"hemorrhoidal cream, cleansing pads, suppository pads, and a stool softener"), *adopted*, 2011

WL 1214431 (N.D.N.Y. Mar. 31, 2011).

On April 25, 2008, Plaintiff's symptoms surely did become more severe: he "bled while

defecating and felt 'tremendous pain.'" Pl. 56.1 Resp. ¶ 73. He saw a nurse during sick call on

April 28, who referred him to Dr. Bendheim in the clinic. Bendheim prescribed Epsom salts,

Preparation H, and an ointment, and indicated that Plaintiff "may benefit" from a surgery

consultation—a question ultimately to be determined by Rodas, his primary care provider. *Id.*

¶ 75. The very next time that Rodas met with Plaintiff—on May 1, 2008, three days after

Bendheim did—it is undisputed that he "submitted a consultation request for plaintiff to see a

surgeon for follow-up." *Id.* ¶ 78. At that point, Rodas recognized (and wrote in his consultation

request) that the conservative course of treatment he had previously recommended was "no

longer effective." *Id.* But at that point, of course, Rodas also altered that conservative course of

treatment by requesting that Plaintiff see a surgeon. And after the surgeon, Roth, recommended

surgery and a colonoscopy, Rodas "submitted a request for consultation for further evaluation

based on the surgeon's recommendation." *Id.* ¶ 81. No reasonable jury could find that in taking

these steps, Rodas was simply "persist[ing] in a course of treatment known to be largely

ineffective," as Plaintiff claims. Pl. Opp. at 15.

It is undisputed that Koenigsmann initially denied the request for surgery because he

believed a colonoscopy should be performed first in order to rule out more serious causes of

Plaintiff's symptoms. Pl. 56.1 Resp. ¶ 82. And at that point, the evidence plausibly suggests that Rodas made a mistake. Antonelle's report stated that Plaintiff's hemorrhoids were "easily reducible," and he prescribed "Anusol hydrocortisone cream and follow-up as needed." He also recommended a "[f]ollow up [c]olonoscopy in 10 years." *Id.* ¶¶ 90, 91. Rodas asserts that he interpreted this report, which did not mention surgery, as an indication that Antonelle believed that surgery was unnecessary, and he therefore did not submit a further request for Plaintiff to undergo surgery. *Id.* ¶ 93; Rodas Supp. Decl., Dawkins Decl. Ex. F, ¶ 8 ("Dr. Antonelle, an expert in the field of gastroenterology, did not write . . . that the surgery was necessary after the colonoscopy. I interpreted Dr. Antonelle's written report to mean that since the colonoscopy revealed that plaintiff's hemorrhoids were easily reducible, the Anusol cream was sufficient and further surgical procedures [were] unnecessary.") (citations omitted).

Plaintiff disputes Rodas's interpretation because Antonelle did not intend for his report to have any bearing on whether Plaintiff needed surgery, and because a colonoscopy is not part of a course of treatment for hemorrhoids. Pl. 56.1 Resp. ¶¶ 83, 91–94. But because the deliberate indifference standard is subjective, *see Farmer*, 511 U.S. at 837, neither what Antonelle intended nor what Rodas objectively should have understood the colonoscopy results to mean can suffice to establish that Rodas was "actually aware" that Plaintiff still required surgery in order to address a "substantial risk" of "serious harm." *See Salahuddin*, 467 F.3d at 282 ("the mental-state inquiry does not include an objective-reasonableness test"). At most, the evidence presented by Plaintiff suggests that Rodas was negligent, which is insufficient.

Plaintiff points to no direct evidence to counter Rodas's testimony that he interpreted Antonelle's report as indicating that surgery was not required. Nor could a reasonable jury infer from other evidence in the record that Rodas's explanation is pretextual. *See Salahuddin*, 467

15

F.3d at 282 (asking, in the absence of direct evidence, whether "circumstantial evidence" contradicted defendant's showing "that [he] was not aware of a substantial risk that postponing [plaintiff's] liver biopsy would cause serious harm"). Rodas is not a doctor, and in any case Plaintiff never suggests that Rodas's interpretation of Antonelle's report was so egregiously incorrect from a medical standpoint that his explanation is implausible.[7] Nor was Plaintiff's condition so severe as to suggest that Rodas must have known surgery was necessary. *See Farmer*, 511 U.S. at 842 ("a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious"). Plaintiff describes reporting severe pain to Rodas and the medical staff before his colonoscopy, but not after. Pl. 56.1 Resp. ¶ 80. On September 16, 2008, roughly a month after his colonoscopy, Plaintiff complained to Rodas that his hemorrhoid condition was "deteriorating," but although he now claims that he was in severe pain at the time, he does not say that he communicated the extent of his pain to Rodas—his September 16 appointment dealt primarily with "complaints of pain in the left side of his abdomen." *Id.* ¶ 96. Additionally, while Plaintiff complained of hemorrhoids on other occasions after his colonoscopy and was given hemorrhoid cream, there is no evidence that he complained of severe pain.[8] *Id.* ¶¶ 98, 101, 103. He did not complain about not receiving surgery until February 2009. *Id.* ¶ 106. And throughout this period, Rodas continued to treat Plaintiff for

---

[7] In fact, Bernstein, who denied Plaintiff's grievance requesting that Rodas be relieved as his primary care provider, concluded that Plaintiff was receiving "good medical care" in part because "plaintiff's colonoscopy . . . was normal," suggesting that at least one doctor also believed that Antonelle's colonoscopy report indicated that Plaintiff did not require surgery. Pl. 56.1 Resp. ¶ 127; *see* Mauro Decl., Hawkins Decl. Ex. O.

[8] Consistent with the lack of evidence supporting Plaintiff's claim with respect to Rodas's mindset, Rodas testified that Plaintiff's lack of complaints in the aftermath of his colonoscopy confirmed his interpretation of Antonelle's report. *See* Rodas Dep., Youngwood Decl. Ex. A, at 229–30 (stating that because "the GI . . . recommended to use cream for the hemorrhoids" and "didn't recommend any surgery," and because Plaintiff "didn't complain" about hemorrhoids after his colonoscopy, Rodas believed "that the hemorrhoids [were] resolved.").

other ailments, including requesting a surgical consult for a growth on Plaintiff's forehead. *Id.* ¶ 100. Plaintiff does not explain why Rodas, who filled out several consultation requests on his behalf—including the May 23, 2008 and June 16, 2008 requests related to hemorrhoids—would refuse to request a hemorrhoidectomy that he actually believed was necessary.

Plaintiff's hemorrhoid condition worsened again in February and March of 2009. On February 17, 2009, he saw Bhopale, who reported that Plaintiff's "rectal exam was normal." Pl. 56.1 Resp. ¶ 104. Plaintiff then saw Rodas ten days later and requested surgery, which Rodas denied because Plaintiff's "rectal examination had been normal." *Id.* ¶ 105. Plaintiff attempts to cast doubt on Rodas's motivations by claiming that Bhopale's examination was inadequate, but he does not explain why Rodas would have known about any inadequacy. *Id.* ¶ 104. Thus, there is no evidence suggesting that Rodas actually thought Plaintiff required surgery. That Rodas allegedly said that Plaintiff's surgery had been denied and that Plaintiff would have to file a grievance if he wanted surgery is somewhat troubling, *id.* ¶ 105, but the most straightforward interpretation of Rodas's behavior is that, in light of Antonelle's and Bhopal's reports, he strongly believed that Plaintiff did not need surgery. The Court cannot conclude that a reasonable jury could infer the opposite. At most, Rodas's statement that he was "not going to do anything else" on Plaintiff's behalf suggests that *if* he thought Plaintiff faced a risk of serious harm, he still would not request surgery. But it does not by itself suggest that he *did* believe that Plaintiff faced such a risk at the time, and, as explained above, there is no other evidence from which to infer that he did. Rodas also ordered "a complete blood count and stool samples" following the appointment, negating any inference that his comments evidenced a complete refusal to treat Plaintiff. Pl. 56.1 Resp. ¶ 105.

17

Plaintiff filed a grievance requesting surgery on March 6, 2009, and on March 17, 2009, Bernstein responded to the grievance by stating that Plaintiff would be sent to a general surgeon to determine whether he was an "appropriate candidate for surgical treatment." Pl. 56.1 Resp. ¶¶ 108, 110. As a result, Rodas requested a surgical consultation, which Koenigsmann approved. *Id.* ¶ 111. The fact that Bernstein reached a different conclusion than Rodas is not sufficient to establish Rodas's deliberate indifference. *See, e.g.*, *Chapman v. Parke*, 946 F.2d 894 (Table), 1991 WL 203080, at *1–2 (6th Cir. 1991) (disagreement between doctors over plaintiff's need for hemorrhoid surgery did not evidence deliberate indifference); *Webb v. Jackson*, No. 92 Civ. 2149 (SS), 1994 WL 86390, at *3 (S.D.N.Y. Mar. 16, 1994) ("It is well established that a mere difference[] in opinion, whether between doctors or laymen, based on medical care does not give rise to an Eighth Amendment violation . . . ."). Between March 17 and July 2, when Plaintiff received a hemorrhoidectomy, Rodas admitted Plaintiff to the infirmary, and while the parties characterize Plaintiff's condition during that period in different ways, there is nothing from which a jury could infer that Rodas himself delayed Plaintiff's surgery or otherwise could have done anything differently to reduce Plaintiff's risk of harm.

To summarize, the Court's review of the record has uncovered no basis for concluding that at any point, Rodas himself subjectively believed that his prescribed course of treatment for Plaintiff's hemorrhoid symptoms put Plaintiff at a substantial risk of serious harm. Plaintiff never claims that he was denied treatment. *See, e.g.*, *Estelle*, 429 U.S. at 107–08 (no deliberate indifference where plaintiff was treated many times by medical staff); *Poole v. Koehler*, No. 87 Civ. 6881 (PNL), 1992 WL 316179, at *1 (S.D.N.Y. Oct. 19, 1992) (no deliberate indifference where defendants introduced "several affidavits and numerous medical records demonstrating that plaintiff received on-going medical attention and care"). And Plaintiff's argument that

18

Rodas persisted in prescribing non-surgical treatments that he knew to be inadequate does not accurately describe the record. No reasonable jury could conclude that Rodas ever believed Plaintiff required surgery but prescribed non-surgical treatment instead. When Plaintiff's condition worsened in 2008, Rodas requested a surgical consultation, and when it worsened in 2009, nothing suggests that Rodas actually believed that Plaintiff faced a significant risk of serious harm without surgery. Even assuming that Rodas interpreted Antonelle's colonoscopy report incorrectly, that is at most evidence from which a reasonable jury could conclude that Rodas acted negligently, and not that he acted with deliberate indifference. As a result, the Court concludes as a matter of law that Rodas did not have a sufficiently culpable state of mind to support Plaintiff's Eighth Amendment claim against him.

The case law that Plaintiff relies upon does not require a different result. First, Plaintiff cites two cases purportedly establishing that a defendant acts with deliberate indifference by "fail[ing] to investigate the cause of an inmate's medical condition." Pl. Opp. at 13–14, 14–15 (citing *Liscio v. Warren*, 901 F.2d 274 (2d Cir. 1990), *overruled by Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009); and *Burton v. Lynch*, 664 F. Supp. 2d 349, 364 (S.D.N.Y. 2009)). Plaintiff argues that there is a factual dispute regarding whether Rodas "appropriately examined" Plaintiff, because despite Rodas's testimony to the contrary, Plaintiff maintains that Rodas never conducted a "physical examination of [his] rectum" throughout the course of his treatment. Pl. Decl., Youngwood Decl. Ex. D, ¶ 17. On its own, however, the question of whether Rodas's examination techniques were objectively "appropriate" as a medical matter is only tangentially relevant to his subjective culpability.

As an initial matter, *Liscio v. Warren*, 901 F.2d 274, has been overruled—the Second Circuit recently described it as applying an "objective standard" that is no longer "good law"

after *Farmer*.[9]  *Caiozzo*, 581 F.3d at 70.  In any event, the defendant in *Liscio* had seen medical records suggesting that the plaintiff was suffering from alcohol withdrawal—a condition that was "both life-threatening and fast-degenerating"—yet he failed to examine the plaintiff *at all* for three days.  *Id.* at 276–77.  From those facts, a jury could arguably infer that the defendant knew the plaintiff was in danger, yet did nothing.  The second case that Plaintiff cites, *Burton v. Lynch*, 664 F. Supp. 2d 349, is readily distinguishable too: the defendant there knew the plaintiff's elbow was in severe pain, did not examine it, brusquely told the plaintiff there was "nothing wrong with" it, and prescribed Motrin, to which he knew the defendant was allergic.  *Id.* at 355, 355–56.  In this case, even if the nature of Rodas's examinations is disputed, he clearly knew that Plaintiff had hemorrhoids, and nothing suggests that he subjectively believed that the treatments he was prescribing were inappropriate.  In this context, Plaintiff's complaint that Rodas should have conducted a physical examination is the kind of difference in opinion that cannot establish deliberate indifference.  *See Estelle*, 429 U.S. at 107 ("the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment"); *Joiner v. Greiner*, 195 F. Supp. 2d 500, 504–05 (S.D.N.Y. 2002) (failure to perform an MRI did not establish deliberate indifference).

Second, Plaintiff cites several cases supporting his argument that Rodas knew non-surgical treatments were largely ineffective yet continued prescribing them anyway.  Pl. Opp. at 14, 16.  In *Hathaway v. Coughlin*, 37 F.3d 63 (2d Cir. 1994), the Second Circuit held that a

---

[9] Plaintiff describes *Liscio* as "overruled on other grounds."  Pl. Opp. at 14.  But he cites it for the proposition that failing to examine an inmate can constitute deliberate indifference, despite the fact that the deliberate indifference standard that the *Liscio* court employed is no longer good law.  *See Caiozzo*, 581 F.3d at 70.  Thus, the case appears to have been overruled on very much the same ground for which Plaintiff cites it.

rational jury could find[10] deliberate indifference where the defendant knew an inmate was in pain because of two broken pins in his hip, did not tell him about the pins, and waited two years to seek a surgical consultation despite receiving more than fifty complaints of severe pain. 37 F.3d at 67–69. The court put significant weight on the non-disclosure: one could infer that the defendant knew the plaintiff would elect surgery had he known about the pins, and that withholding that information effectively denied him the surgery. *See also Hernandez*, 341 F.3d at 146 (discussing *Hathaway*). By contrast, Rodas did not withhold information, nor did he deliberately withhold surgery: he referred Plaintiff for a surgical consult in 2008, when Plaintiff's complaints first became severe, and the evidence shows that he believed that surgery was unnecessary after Antonelle's report.

Additionally, unlike in *Hathaway*, where the plaintiff "continued to experience great pain over an extended period of time" and complained of that pain to the defendant, 37 F.3d at 67, 68, there is no evidence that Plaintiff's hemorrhoid complaints were accompanied by reports of severe pain between his colonoscopy and February 2009, shortly before he was again referred for surgery. And even assuming that Rodas was, in fact, aware that Plaintiff was in pain, the delay for which he is responsible is at most seven months: from the time of Antonelle's colonoscopy on August 5, 2008, to March 17, 2009, when Rodas again requested a surgical consultation. Plaintiff received treatment over that interval. The delay in his surgery does not evidence deliberate indifference under these circumstances. *See Demata v. N.Y. State Corr. Dep't of Health Servs.*, 198 F.3d 233 (Table), 1999 WL 753142, at *1, *2 (2d Cir. Sept. 17, 1999) (although plaintiff did not receive knee surgery for three years and "complained of knee pain on

---

[10] *Hathaway* was decided on appeal of the district court's order denying the defendant's Rule 50 motion following a trial at which the jury was deadlocked. *See* 37 F.3d at 66.

multiple occasions," he received other treatment and the delay did not "rise to the egregious level identified in *Hathaway*"); *cf. Harrison v. Barkley*, 219 F.3d 132, 138 (2d Cir. 2000) (one-year delay in treating plaintiff's cavity, where there was no evidence that defendants would have treated it absent plaintiff's consent to unwanted procedure on another tooth, raised factual issue as to deliberate indifference); *Stevens v. Goord*, 535 F. Supp. 2d 373, 388–89 (S.D.N.Y. 2008) (unfounded assertion that plaintiff's chest pain and respiratory symptoms were "essentially untreatable," which led to no treatment at all for nine months, raised factual issue).[11]

Finally, Plaintiff argues that Rodas disregarded the recommendations of Plaintiff's treating physicians. Pl. Opp. at 17–18 (citing *Johnson v. Wright*, 412 F.3d 398 (2d Cir. 2005); and *Jones v. Simek*, 193 F.3d 485 (7th Cir. 1999)). Again, however, disregarding a treating physician's recommendation demonstrates deliberate indifference only if it permits an inference of subjective culpability. In *Johnson*, it was "beyond cavil that all of plaintiff's treating physicians, including two prison physicians, expressly recommended that the plaintiff be prescribed Ribavirin," and the defendants ignored them. 412 F.3d at 405; *see also Jones*, 193 F.3d at 490 (defendant "knew that something might be seriously wrong," failed to give him pain medication for six months before referring him to specialists, and then failed to follow the specialists' prescriptions). In this case, the only available inference to be drawn from the record is that Rodas thought he was *following* Antonelle's recommendation by not scheduling surgery.

---

[11] The other cases Plaintiff cites are readily distinguishable. *See Rodriguez v. Downstate Corr. Facility*, No. 00 Civ. 9337 (LAP), 2003 WL 1698204, at *6–7 (S.D.N.Y. Mar. 31, 2003) (defendant expressed fear that plaintiff would die without a transfer to another facility but did not seek such a transfer); *Ruffin v. Deperio*, 97 F. Supp. 2d 346, 354 (W.D.N.Y. 2000) (plaintiff's deterioration, which included "blackening of his toes" and "glycerin levels which were regularly three to five times the normal levels," was "sufficiently obvious to infer the defendants' actual knowledge of a substantial risk"); *Pugliese v. Cuomo*, 911 F. Supp. 58, 62–63 (N.D.N.Y. 1996) (upon transfer to a new facility, plaintiff's treatment was discontinued against his doctors' advice, and his condition deteriorated to the point that he could not lift a one-pound weight with his left arm). Both *Rodriguez* and *Pugliese* also rely on *Liscio*, which, as noted in the text, is no longer good law.

In short, Plaintiff's efforts to squeeze the facts of this case into favorable doctrinal boxes fail; the evidence of subjective culpability is insufficient as a matter of law, and Rodas is entitled to summary judgment on Plaintiff's Eighth Amendment claim.

### 4.  Koenigsmann Was Not Deliberately Indifferent

The Court also concludes that the evidence is insufficient to permit a reasonable jury to conclude that Koenigsmann was deliberately indifferent.  Unlike Rodas, Koenigsmann was not involved in Plaintiff's day-to-day medical care.  Thus, Plaintiff's argument that Koenigsmann violated the Eighth Amendment centers on just one decision: his denial of Rodas's request that Plaintiff receive surgery for his hemorrhoid condition.[12] Pl. Opp. at 18, 24.

Plaintiff suggests that Koenigsmann should not have denied the request for surgery.  But to say that he "denied" the request is to oversimplify: it is undisputed that he did so because he believed that it was medically necessary for Plaintiff to undergo a colonoscopy to rule out more severe causes of his symptoms.  *See* Pl. 56.1 Resp. ¶¶ 82–83; Koenigsmann Dep., Youngwood Decl. Ex. B, at 158–64.  According to Plaintiff, Defendants' assertion that "all medical professionals agree" that Koenigsmann's decision was correct is unsupported, Pl. Opp. at 18, but at least two other doctors agreed that a colonoscopy was appropriate.  *See* Freed Report, Dawkins Decl. Ex. B, at 3 ("Ordering the colonoscopy . . . was good medical practice in view of the persistent bleeding to rule out other more potentially dangerous conditions like cancer."); Bendheim Dep., Dawkins Decl. Ex. H, at 249 (opining that it would have been "irresponsible" not to conduct a colonoscopy first).  Had he known that Antonelle's colonoscopy had come back

---

[12] The 2AC includes a claim of "supervisory liability" alleged against Koenigsmann. 2AC ¶¶ 41–43. Except insofar as the denial of Plaintiff's surgery is concerned, Plaintiff has abandoned any claim premised on Koenigsmann's role as supervisor. Pl. Opp. at 24; *see also Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (where a defendant does not participate personally in a violation, he may be liable under § 1983 only if he refused to remedy the violation after learning of it, implicitly sanctioned it, or was grossly negligent in supervising subordinates who caused it).

normal, Koenigsmann (unlike Rodas) might well have interpreted it to mean that surgery was necessary. But there is no evidence that he received or knew about Antonelle's report. *See* Koenigsmann Decl., Dawkins Decl. Ex. G, ¶ 15 ("It would not have been necessary for . . . Rodas to notify me of Dr. Antonelle's recommendations.").

Perhaps Koenigsmann can be faulted for not following up on Rodas's initial request, since denying it meant that another surgery request should have been forthcoming if the colonoscopy came back normal. But his failure to do was at most negligent, and therefore insufficient to support an Eighth Amendment claim. *See Salahuddin*, 467 F.3d at 282 (postponing biopsy was not evidence of deliberate indifference because no one "aroused [the defendant's] suspicion that postponing the biopsy rather than allowing treatment to proceed would be seriously harmful"); *Hernandez*, 341 F.3d at 147 (defendants' failure to "follow up on the duties of others" to put a medical hold on plaintiff "arguably could support a finding of negligence," but plaintiff "presented no evidence that the defendants had any reason to doubt [the others'] reliability"). The same is true of Plaintiff's argument that Koenigsmann could have approved the surgery while simultaneously ordering a colonoscopy to be performed first. Pl. Opp. at 18. Whether or not his failure to do so was a mistake, it does not demonstrate deliberate indifference. As a result, Koenigsmann is entitled to summary judgment on Plaintiff's Eighth Amendment claim.

### B. Retaliation Claim

In Count 2, brought pursuant to § 1983, Plaintiff alleges that Rodas retaliated against him for filing a grievance by confining him to Green Haven's infirmary, in violation of the First Amendment. 2AC ¶¶ 38–40. Defendants concede that filing a grievance is a protected activity, but the parties dispute whether Plaintiff suffered any "adverse action," and, if so, whether there

24

was a "causal connection between the protected [activity] and the adverse action." *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) (setting forth the elements of a retaliation claim) (quoting *Morales v. Mackalm*, 278 F.3d 126, 131 (2d Cir. 2002)) (internal quotation mark omitted). As explained below, however, the Court need not reach these arguments because Plaintiff failed to exhaust his administrative remedies with respect to his retaliation claim.

1.  Plaintiff Failed to Exhaust His Administrative Remedies

In most § 1983 cases, the plaintiff need not exhaust administrative remedies before bringing suit. *See Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 516 (1982). But this general rule does not apply to prisoners. Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).[13] The failure to exhaust administrative remedies is an affirmative defense to a prisoner's claim, *Jones v. Bock*, 549 U.S. 199, 216 (2007), and Defendants bear the burden of demonstrating that Plaintiff's claim is not exhausted, *Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009).

To satisfy the PLRA's exhaustion requirement, a plaintiff must invoke all available administrative mechanisms, including appeals, "through the highest level for each claim." *Varela v. Demmon*, 491 F. Supp. 2d 442, 447 (S.D.N.Y. 2007); *Veloz v. New York*, 339 F. Supp. 2d 505, 514 (S.D.N.Y. 2004). These mechanisms are prescribed by the applicable prison grievance process, and not by the PLRA itself. *See Jones*, 549 U.S. at 218. In New York, where

---

[13] Plaintiff correctly does not contest that his retaliation claim is a claim "brought with respect to prison conditions." The Supreme Court has clarified that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see also, e.g., Espinal v. Goord*, 558 F.3d 119, 127 (2d Cir. 2009) (assessing whether plaintiff exhausted retaliation claim).

Plaintiff is incarcerated, there is a three-tiered process for adjudicating inmate complaints: "(1) the prisoner files a grievance with the Inmate Grievance Resolution Committee ('IGRC'), (2) the prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility, and (3) the prisoner then may appeal an adverse decision by the superintendent to the Central Officer Review Committee ('CORC')." *Espinal v. Goord*, 558 F.3d 119, 125 (2d Cir. 2009); *see* N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5(b)–(d).

The facts related to Defendants' exhaustion defense are not contested. On April 3, 2009, after Plaintiff was discharged from the infirmary, he filed grievance GH-67076-09, which alleged that his confinement to the infirmary was retaliatory. Pl. 56.1 Resp. ¶ 126. Plaintiff does not dispute Defendants' statement that he "did not file an appeal of GH-67076-09 to the Superintendent's office." *Id.* ¶ 128. As a result, Defendants have established as a matter of law that Plaintiff failed to invoke the second level of review required by New York law. Nor does Plaintiff suggest that further review was somehow not "available" to him. *See Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004) ("Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact 'available' to the prisoner.").[14]  Indeed, the record shows that he appealed another grievance regarding his medical treatment to both the superintendent and the CORC. Pl. 56.1 Resp. ¶¶ 132–136. But

---

[14] *Hemphill* set forth a framework governing PLRA exhaustion defenses that asks (1) whether administrative remedies were actually available, (2) whether the defendants forfeited or waived their exhaustion arguments, and (3) whether any "special circumstances" justify the plaintiff's failure to exhaust. 380 F.3d at 686; *see also, e.g.*, *Macias v. Zenk*, 495 F.3d 37, 41 (2d Cir. 2007). *But cf. Smith v. City of New York*, No. 12 Civ. 3303 (CM), 2013 WL 5434144, at *9 (S.D.N.Y. Sept. 26, 2013) (questioning *Hemphill*'s continued vitality in light of subsequent Supreme Court decisions requiring strict compliance with grievance procedures but following it "in the absence of a clear indication that [it] has been overruled"). The parties do not explicitly invoke *Hemphill*'s three-part approach, which seems most relevant where the plaintiff advances some reason for not exhausting his remedies—which Plaintiff does not do. In any case, the Court has addressed whether administrative remedies were available, the next section of this opinion discusses waiver, and Plaintiff does not argue that any "special circumstances" are present.

because he did not do the same for his retaliation claim, the PLRA's exhaustion requirement bars him from asserting that claim in this Court.

The Court rejects Plaintiff's argument that his exhaustion of *another* grievance—GH-67116-09—should excuse his failure to exhaust GH-67076-09. Pl. Opp. at 23. In support of that argument, Plaintiff cites a single decision from the Eastern District of Pennsylvania, *Thomas v. Zinkel*, 155 F. Supp. 2d 408 (E.D. Pa. 2001). In *Thomas*, the plaintiff fell and grieved both the working conditions leading to his fall and his subsequent medical care, but he exhausted only the latter grievance. The court deemed the plaintiff's working-conditions claim exhausted nonetheless, because it was "evident" from his medical-care claim that "he was also grieving the dangerous conditions." *Id.* at 413.

In this case, the Court is at a loss to see how the allegations in GH-67116-09 have anything to do with Plaintiff's retaliation claim. That grievance concerned an appointment with Rodas on April 6, 2009, in which Rodas asked Plaintiff to provide a urine sample. Plaintiff complained that Rodas's "attitude . . . was very unprofessional and hostile," asserted that Plaintiff was having trouble communicating with Rodas, and asked for Rodas to no longer be his primary care provider. Pl. 56.1 Resp. ¶ 132. As Plaintiff notes, the PLRA's exhaustion requirement is intended to allow prison officials an opportunity to address complaints before the federal courts do. *See Woodford v. Ngo*, 548 U.S. 81, 93 (2006); *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002). For that reason, "inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004), *overruled on other grounds by Woodford*, 548 U.S. at 94–95. The officials evaluating Plaintiff's exhausted claim on appeal would not have had any inkling that Rodas had even placed Plaintiff in the infirmary, much less that his doing so was

allegedly retaliatory. The Court therefore concludes as a matter of law that Plaintiff did not exhaust his retaliation claim.

### 2. Rodas Did Not Waive His Exhaustion Defense

Plaintiff also argues that any failure to exhaust his administrative remedies is irrelevant because Rodas waived his exhaustion defense. Indeed, the PLRA's mandatory exhaustion requirement is not jurisdictional: because the failure to exhaust administrative remedies is an affirmative defense, it can be waived. *See Johnson*, 380 F.3d at 695. Plaintiff contends that Rodas waived this defense by failing to raise it in his first summary judgment motion, in 2011. Pl. Opp. at 22. The Court disagrees.

Plaintiff has amended his complaint twice since Judge Jones denied the initial summary judgment motion filed by Rodas and Bernstein. "[A]n amended complaint ordinarily supersedes the original and renders it of no legal effect." *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977). When Plaintiff amended his complaint, Defendants were entitled to amend their answer to assert new defenses. *See, e.g., Diesel Props S.r.L. v. Greystone Bus. Credit II LLC*, No. 07 Civ. 9580 (HB), 2008 WL 4833001, at *5 (S.D.N.Y. Nov. 5, 2008). Defendants raised Plaintiff's failure to exhaust as an affirmative defense in answering the 2AC, thereby preserving that defense for purposes of this motion. *See, e.g., Avent v. Solfaro*, No. 02 Civ. 914 (DAB) (RLE), 2010 WL 2985904, at *3 (S.D.N.Y. July 29, 2010) ("Having raised the defense in their Answer, Defendants clearly have not waived the exhaustion defense."); *see also Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999) (holding that exhaustion defense was not waived despite defendants' failure to raise it in answering plaintiff's earlier pleadings); *Legal Aid Soc'y v. City of New York*, 114 F. Supp. 2d 204, 222 (S.D.N.Y. 2000) (same).[15] Moreover, Plaintiff

---

[15] The Second Circuit has held that defenses involving "core issue[s] of a party's willingness to submit a dispute to judicial resolution," are not revived by the filing of an amended complaint. *Gilmore v. Shearson/Am. Exp. Inc.*, 811

does not argue that he was prejudiced by Rodas's failure to raise exhaustion earlier. The parties were able to take discovery after Defendants answered the 2AC, at which point Plaintiff was on notice that his failure to exhaust was at issue. *See* Dkt. No. 53 (providing that discovery would extend for three months after Defendants' answer); *Shariff v. Coombe*, 655 F. Supp. 2d 274, 287 (S.D.N.Y. 2009) (rejecting plaintiffs' waiver argument because it was "apparent to the Court that the parties have produced discovery on the exhaustion issue").

Plaintiff's reliance on *Handberry v. Thompson*, 436 F.3d 52 (2d Cir.), *amended on other grounds on reh'g*, 446 F.3d 335 (2d Cir. 2006), is unavailing. In *Handberry*, the Second Circuit affirmed the district court's conclusion that certain defendants could not raise an exhaustion defense on summary judgment because all the information relevant to that defense was available before discovery—at which time the defendants *denied* that the defense applied, suggesting to the plaintiffs that "prison grievance procedures were not available" for them to invoke. *Id.* at 60. Unlike in this case, there were no intervening amendments that altered the set of claims and defenses subject to litigation. Also unlike in this case, the plaintiffs in *Handberry* were given the impression that discovery would be irrelevant to exhaustion.

Accordingly, the Court concludes that Rodas has not waived his failure-to-exhaust defense. And because the undisputed record evidence establishes that Plaintiff failed to exhaust his administrative remedies, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's retaliation claim.

---

F.2d 108, 112 (2d Cir. 1987), *overruled on other grounds by Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271 (1988). But that principle appears to be applicable only to the kinds of defenses listed in Federal Rule of Civil Procedure 12(b)(2)–(5), which are subject to stricter waiver rules. *See* Fed. R. Civ. P. 12(h); *Rosenberg v. City of New York*, No. 09 Civ. 4016 (CBA) (LB), 2011 WL 4592803, at *15–16 (E.D.N.Y. Sept. 30, 2011); *Pruco Life Ins. Co. v. Wilmington Trust Co.*, 616 F. Supp. 2d 210, 215 (D.R.I. 2009).

IV.    **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in its entirety.  The Clerk of Court is requested to terminate this case.

SO ORDERED.

Dated: March ___, 2014
       New York, New York

ALISON J. NATHAN
United States District Judge